Filed 6/11/14  P. v. Gray CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055764 |
| v. | (Super.Ct.No. RIF10003395) |
| ANDREW WILLIAM GRAY et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Gary B. Tranbarger, Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant Andrew William Gray.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant Timothy Matthew Keiper.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

1

After searching for Hispanics to beat up, Andrew Gray, his brother Colin Gray, and codefendant Timothy Keiper found Armando Ruvalcaba and Raul Flores, two homeless men, in a dark alley. One of the two men died from blunt impact injuries to the head after being kicked there repeatedly by Keiper, and then struck repeatedly in the head by Andrew, who used a wooden two-by-four. Following a jury trial, Andrew Gray was convicted of first degree murder of Flores (Pen. Code,[1] §§ 187, subd. (a), 189), while Keiper was convicted of second degree murder. As to Ruvalcaba, both defendants were convicted of assault with force likely to cause great bodily injury (§ 245, subd. (a)(1)). Gray was sentenced to state prison for 25 years to life, and Keiper was sentenced to 15 years to life for the murder of Flores. Keiper received a determinate term of three years for the aggravated assault, while Gray received a determinate term of one year for that count. Both defendants appealed.

On appeal, Keiper argues the evidence is insufficient to support a conviction for second degree murder under the natural and probable consequences doctrine. Andrew Gray originally filed a brief in accordance with the procedures outlined in *People v. Wende* (1979) 25 Cal.3d 436, but we requested supplemental briefing to address the propriety of the jury instructions defining express and implied malice as elements of first and second degree murder.[2] We affirm.

---

[1] All further statutory references are to the Penal Code, unless otherwise stated.

[2] We deny Andrew Gray's December 26, 2013, supplemental request for replacement of counsel.

2

## BACKGROUND

On October 9, 2009, defendant Andrew Gray (Andrew) called his brother Colin Gray (Colin) to invite Colin over to hang out and drink. Colin went with Andrew to purchase vodka and Kahlua, after which, the two men went to Andrew's residence where they drank shots and White Russians, and listened to music. While they hung out together and drank, they decided to go to Corona and find some Hispanic people to fight. Andrew said he was interested in "getting into it" with some Mexicans. Because neither Andrew nor Colin drove, they called defendant Timothy Keiper to pick them up, telling Keiper they wanted to go look for a fight. Keiper agreed to take them to Corona.

Keiper went to Andrew's apartment with his girlfriend, Ariel Sesmas, where the foursome drank together for approximately 15 minutes to a half hour, finishing off the liquor. Then the group left to drive around Corona for a while. Keiper pumped up Andrew and Colin with the plan of finding something to do, or someone to hang out with, or a fight. They discussed a fight and a target in the car. As they drove, they looked for Hispanics and gang bangers. Specifically, Andrew was looking for "dirty Mexicans," while Colin was looking for perverts and rapists.

As they approached Sixth Street, one of the members of the group identified two men in a dark alley. The two men, unknown to the defendants, were Armando Ruvalcaba and Raul Flores, who were homeless. Ariel remained in the car, while the three men went into the dark alley.

Andrew and Keiper entered the alley first, followed by Colin, for an attack. Andrew and Keiper approached Raul Flores, where Keiper began kicking Flores. Colin

3

ran up to Armando Ruvalcaba and started punching him. Ruvalcaba fell backwards, stumbled away, and ran off. In the meantime, Andrew hit Flores with a wooden object resembling a two-by-four. Flores fell to the ground, face up, but Andrew struck him in the head with the board several more times. Flores was not moving. Keiper was present as Andrew struck Flores with the board; Andrew slammed it pretty hard. Colin yelled at Andrew to stop, and attempted to block a blow with his hand, but was struck in the hand with the board.

Eventually, Andrew, Colin, and Keiper left in Keiper's vehicle. Andrew was holding the wooden two-by-four, which he did not have prior to entering the alley. In the car, they discussed what happened in the alley and Colin wondered if Flores would make it. Colin told Andrew he thought Andrew had killed Flores. Andrew smirked, said he thought so, and stated how he had hit Flores on the head over and over with the two-by-four.

The group returned to Andrew's apartment, where Andrew showed them the wooden two-by-four, which had blood on it, and then hid it under his futon. At some point, everyone left defendant's apartment.

At 11:35 p.m., Officer Tizcareno arrived at the scene in the alley, where he found Ruvalcaba and photographed his injuries. Ruvalcaba had redness and swelling on his left cheek, swelling to his left forearm, and a golf ball-sized lump on the upper left portion of his back.

Flores was admitted to a hospital in a coma, and was pronounced dead on October 11, 2009. At 12:16 a.m. on October 10, 2009, Flores's blood alcohol was 0.18. A

4

forensic pathologist performed an autopsy on Flores on October 13, 2009, and noted multiple areas of impact to the head, as well as abrasions and lacerations to the face, and a skull fracture extending from the forehead along the lateral part of the left eye socket, then underneath the base of the skull, toward the midline. The pathologist concluded that Flores died from blunt impact injuries to his head, but could not determine whether the injuries were inflicted by punch, kick, or weapon.

Colin was informed of the police investigation by a friend, who mentioned that the police had a composite sketch that resembled Andrew. Colin told Andrew about the composite sketch, and Andrew checked the police department website, where he learned the police were investigating the incident in the alley and that Flores was in intensive care. Andrew told Colin he burned the wood in the backyard of a friend's mother's house.

After learning of the investigation, Colin contacted the police department to inform law enforcement that he knew who was responsible. However, when a detective arranged a meeting to speak with Colin, Colin failed to appear. Colin was arrested on October 20, 2009, and entered into a plea bargain with the People for a 15 year sentence.

On January 10, 2010, an individual named Kyle Fraser secretly recorded a conversation between Keiper and Ariel Sesmas. In the conversation, Keiper estimated Flores' age to be at least 50, and admitted he (Keiper) "was excessive." Keiper admitted that while Flores was still standing, Keiper had held him by the collar and repeatedly kicked Flores in the head. When Flores went to the ground, Keiper ran back to the car.

5

Eventually, Andrew was arrested and spent two weeks housed in the same cell with Tom Bradshaw. Andrew admitted to killing a Latino man, explaining that he hit the man twice with the board, the man fell after the second blow, and that he lost it, repeatedly hitting the man with the board. Andrew also said that Flores was a no-good wetback and deserved to die.

By an amended information, Andrew Gray[3] and Keiper were charged with the murder of Flores (§ 187, subd. (a), counts 1, 3), and assault with force likely to produce great bodily injury as to Ruvalcaba. (§ 245, subd. (a)(1), counts 2 & 4.) They were tried by a jury. Gray was found guilty of first degree murder on count 1, while Keiper was convicted of second degree murder on count 3, and both defendants were found guilty of assault with force likely to produce great bodily injury on counts 2 and 4.

Keiper was sentenced to state prison for a term of 15 years to life for the murder count (count 3), and a consecutive mid-term sentence of 3 years for the aggravated assault count (count 4). Gray was sentenced to 25 years to life for the first degree murder (count 1), with a subordinate term of 1 year (one-third the middle term) for the aggravated assault (count 2), which was ordered to run consecutive to count 1. Both defendants appealed.

---

[3] Because Colin is not a party to this appeal, all further references to "Gray" will be to his brother, Andrew.

6

**DISCUSSION**

1. *There Is Substantial Evidence to Support Keiper's Conviction of Second Degree Murder.*

Keiper argues that the evidence is insufficient to support his conviction of second degree murder under the natural and probable consequences doctrine. We disagree.

We begin with the applicable standard of review. In reviewing a sufficiency of evidence claim, our role is limited; we determine whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Smith* (2005) 37 Cal.4th 733, 738-739.) We must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonable deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Reversal is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Mason* (2006) 140 Cal.App.4th 1190, 1199.)

While the jury must agree unanimously the defendant is guilty of a specific crime, there is no requirement that the jury unanimously agree on the same theory of guilt. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132, citing *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1026.) A jury need not decide unanimously whether defendant was guilty as an aider and abettor or as a direct perpetrator. (*People v. Wilson* (2008) 44 Cal.4th 758, 801.)

Murder is the unlawful killing of a human being, or a fetus, with malice aforethought. (§ 187, subd. (a).) Malice aforethought may be express or implied.

7

(§ 188.)  Express malice requires an intent to kill.  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)  A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.  (*People v. Beltran* (2013) 56 Cal.4th 935, 941.)

Implied malice does not require an intent to kill; rather, malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.  (*People v. Gonzalez, supra,* 54 Cal.4th at p. 653, citing *People v. Knoller* (2007) 41 Cal.4th 139 152.)  Phrased in a different way, malice may be implied when a defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1218; see also, *People v. Knoller, supra,* 41 Cal.4th at p. 152.)  An unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation that would support a conviction of first degree murder is second degree murder.  (*Id.* at p. 151.)

The reference to "natural and probable consequences" as it pertains to the definition of implied malice, relates to the element of proximate cause, required for a conviction.  For liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act.  (*People v. Roberts* (1992) 2 Cal.4th 271, 319.)  To satisfy the element of causation in homicide cases, a cause of the victim's death must be an act or omission that

8

sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of the decedent and without which the death would not occur. (*People v. Cervantes* (2001) 26 Cal.4th 860, 866.) It does not necessarily implicate aider and abettor liability.

Keiper argues that the evidence is insufficient to support his conviction of second degree murder under the natural and probable consequences doctrine. His argument assumes he was found guilty of murder under an aiding and abetting theory, and argues it was not foreseeable that Gray would obtain a two-by-four to use to hit Flores. However, the prosecutor argued to the jury that Flores died from a beating and that both defendants beat him. As an active participant or direct actor, Keiper was guilty of second degree murder because he did an act (repeatedly kicking a person in the head) with a high probability that it would result in death, with malice aforethought, but without express malice. The two defendants planned in advance to beat up Hispanic men, and then attacked Flores in a two-on-one attack. Keiper acted with a base antisocial motive and with a wanton disregard for human life. He committed an act which had a high probability of causing death.

Even if Gray's particular act of using a two-by-four was not actually foreseen by Keiper, Keiper repeatedly kicked Flores in the head. This act showed wanton disregard for life. According to the pathologist, the combination of all the injuries resulted in Flores' death, and he could not determine whether the injuries were inflicted by punch, kick, or weapon. In other words, Keiper was an active participant in the murder, not a passive aider and abettor.

9

Even as an aider and abettor, liability under the natural and probable consequences doctrine is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted. (*People v. Medina* (2009) 46 Cal.4th 913, 920.) The question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. (*People v. Maciel* (2013) 57 Cal.4th 482, 520, citing *People v. Mendoza* (1998) 18 Cal.4th 1114, 1133; see also, *People v. Prettyman* (1996) 14 Cal.4th 248, 260-262.)

For a criminal act to be a "reasonably foreseeable" or a "natural and probable" consequence of another criminal design, it is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 530.) Prior knowledge that the perpetrator plans to use a weapon is not necessarily required. (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.)

Thus, murder has been deemed to be the reasonably foreseeable result of a plan to commit robbery and/or burglary (see, *People v. Prettyman*, *supra*, 14 Cal.4th at pp. 262-263), and a fatal shooting during a gang-related fistfight has been held to be the natural and probable consequence of the fistfight. (*People v. Gonzalez* (2001) 87 Cal.App.4th 1, 10-11; see also, *People v. Montes*, *supra*, 74 Cal.App.4th 1050, 1056 [shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight in which defendant used a chain]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376 [defendant punched victim during gang fight, leading to fatal shooting of victim by

fellow gang member]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 501-502 [fatal stabbing of rival gang member during or after fistfight was natural and probable consequence of fistfight]; *People v. Montano* (1979) 96 Cal.App.3d 221, 226 [shooting of victim was natural and probable consequence of defendant's aiding/abetting of battery on the victim].)

Here, Keiper actively participated in a brutal beating of Flores, after encouraging and promoting Gray's violent intent to beat up Hispanics. Whether or not he was actually aware Gray would pick up a two-by-four to beat Flores to death does not mitigate his conduct. There is sufficient evidence to support Keiper's second degree murder conviction.

2. *Any Error In the Instructions Regarding Express and Implied Malice Was Harmless As To Gray's Conviction of First Degree Murder.*

*a. Introduction*

At trial, the court instructed the jury on the elements of first and second degree murder using CALCRIM No. 520 and CALCRIM No. 521. During deliberations, the jury sent a question to the court, stating it was unclear on the difference between first and second degree murder, and asking for a better description of "what second degree includes." In response, the court provided a supplemental instruction.[4]

---

[4] The supplemental instruction read: "The difference between First Degree Murder and Second Degree Murder is this: [¶] First Degree Murder is a murder in which the perpetrator commits the act that caused the death while having the mental state of Express Malice, and, this mental state was formed after premeditation and deliberation. [¶] Second Degree Murder is a murder in which the perpetrator commits the act that caused the death while either (a) having the mental state of Express Malice without

*[footnote continued on next page]*

11

On appeal, defendant Gray initially filed a brief in accordance with the procedures outlined in *People v. Wende, supra,* 25 Cal.3d 436. We reviewed the record and requested supplemental briefing to answer the following questions: (1) Do CALCRIM Nos. 520 and 521 correctly define express and implied malice as elements of first and second degree murder?; (2) Did the court's supplemental instruction (provided in response to a jury question) accurately explain the difference between first and second degree murder?; and (3) If any of the instructions were incorrect, was Andrew prejudiced by them?

Defendant Gray submitted a supplemental brief, arguing that the jury was misinstructed on the definitions of express and implied malice with respect to first and second degree murder. We conclude that any instructional error was harmless beyond a reasonable doubt.

b. *General Principles and Standard of Review.*

In reviewing a purportedly erroneous instruction, we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. (*People v. Richardson* (2008) 43 Cal.4th 959, 1038.) In conducting this inquiry, we are guided by the policy that a single instruction to a jury

_____

*[footnote continued from previous page]*
premeditation and deliberation; or (b) having the mental state of Implied Malice. [¶] Please refer to your other instructions for definitions of all of the legal terms used in this answer. [¶] This answer is not a substitution for the complete jury instructions that you have already received, and it is intended to be completely consistent with those instructions. If you believe that this answer is inconsistent with the previous instructions, please write a note articulating the perceived inconsistency that I can address the subject again."

may not be judged in artificial isolation, but, rather, must be viewed in the context of the overall charge. (*People v. Frye* (1998) 18 Cal.4th 894, 957, overruled on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421; *People v. Reyes* (2007) 151 Cal.App.4th 1491.)

The trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 866.) Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant. (*People v. Cross* (2008) 45 Cal.4th 58, 67-68; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331.)

### c. Application

First degree murder is the unlawful killing with malice aforethought, premeditation, and deliberation. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Malice may be express (intent to kill) or implied (intentional commission of a life-threatening act with conscious disregard for life. (*Ibid.*) Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder. (*Ibid.*) Implied malice second degree murder does not require the specific intent to kill. (*People v. Rogers* (2006) 39 Cal.4th 826, 873.)

CALCRIM No. 520 is an accurate statement of the law. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1092.) CALCRIM No. 521 is the current instructional

equivalent of former CALJIC No. 8.30, defining generic murder, explaining the types of mental states (express or implied malice) required for generic murder. Gray argues that the court did not correctly define the types of malice required for first and second degree murder. Specifically, he argues that CALCRIM No. 520, as given in this case, suggested that a defendant may be liable for first degree murder even in the absence of express malice, that is, where malice is merely implied.

Our inquiry related to the language of the supplemental instruction, which informed the jury that the defendant was guilty of first degree murder if he acted with express malice, where that mental state was formed after premeditation and deliberation. The supplemental instruction then informed the jury that the defendant could be convicted of second degree murder if he acted with the mental state of express malice or implied malice. The concept of express malice includes that of willfulness. (*People v. Moon* (2005) 37 Cal.4th 1, 28.) A willful murder is an intentional murder and malice is express when there is an intent to unlawfully kill a human being. (*Ibid.,* citing *People v. Young* (1987) 189 Cal.App.3d 891, 910.) Thus, "willful" is synonymous with "express malice." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 604.)

Here, the jury was informed, by way of CALCRIM No. 521, that a person is guilty of first degree murder if he acted willfully, deliberately, and with premeditation. Although initially the jury was instructed that second degree murder may involve either express malice or implied malice, the instructions did not clearly explain that in order to be convicted of first degree murder, the defendant must have acted with express malice. In the supplemental instruction, however, the jury was informed that "First Degree

14

Murder is a murder in which the perpetrator commits the act that caused the death while having the mental state of Express Malice, and, this mental state was formed after premeditation and deliberation." The jury was not informed that "willful" is synonymous with "express malice."

Additionally, while the jury was initially instructed what constituted first degree murder, it was not instructed as to what constituted second degree murder. It was only instructed that the People had the burden of proving whether the murder was of the first or second degree, what was required to find the defendant guilty of first-degree murder, and that if the People did not meet that burden, the jury must find the defendant not guilty of first degree murder.

However, incongruence of the first degree murder instructions does not require reversal. "In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant." (*People v. Hernandez, supra*, 183 Cal.App.4th at p. 1332.) We consider whether, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016-1017.) Reversal is required only if it is reasonably probable that the jury would have returned a different verdict absent the error or errors. (*People v. Rogers, supra,* 39 Cal.4th at pp. 867-868, citing *People v. Watson* (1956) 46 Cal.2d 818, 836-837, fn. omitted.)

It is not reasonably probable that the jury would have returned a different verdict. Gray was looking for Hispanics to beat up. Pursuant to this plan, Gray and his

15

companions found two inebriated homeless Hispanics in a dark alley and proceeded to act on it. After Keiper kicked Flores in the head multiple times, Gray grabbed a two-by-four and proceeded to strike Flores repeatedly in the head, continuing to strike him in the head even after he lay helpless on the ground after the second blow. The act of picking up the two-by-four, and the repeated blows with the two-by-four after Flores lay helpless on the ground manifested a deliberate intent to kill, formed before the killing. Premeditation and deliberation can occur in a brief period of time. (*People v. Brady* (2010) 50 Cal.4th 547, 563, citing *People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

Any error was harmless.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.


We concur:

MILLER

J.

CODRINGTON

J.


16